**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————  )
                                            )
GLENN KERSEY,                   )
                                            )
              Plaintiff,            )
                                            )
       v.                             )        Civil Action No. 96-2639 (RWR)
                                            )
WASHINGTON METROPOLITAN AREA    )
TRANSIT AUTHORITY,          )
                                            )
              Defendant.         )
———————————————————————  )

**MEMORANDUM OPINION**

Plaintiff Glenn Kersey has sued his employer, defendant
Washington Metropolitan Area Transit Authority ("WMATA" or "the
Authority"), for violations of the Rehabilitation Act, which
prohibits discrimination "solely by reason of . . . his
disability." 29 U.S.C. § 794(a) (2000). He alleges that WMATA
discriminated and retaliated against him by denying him
promotions in 1993 and 1995. WMATA denies discriminating or
retaliating against Kersey and has moved for summary judgment,
contending that Kersey's claims are time-barred, that he has not
made a prima facie case of disability discrimination and that he
has not rebutted the legitimate, nondiscriminatory reasons WMATA
has offered for its actions. The magistrate judge concluded that
there were material facts in genuine dispute and recommended that

-2-

the summary judgment motion be denied.[1]  WMATA filed objections,

triggering this de novo review.  28 U.S.C. § 636(b)(1).  Because

there is no genuine dispute that WMATA acted in accord with the

1990 contract it made with Kersey and that it did not modify or

rescind the 1990 contract during the relevant period, Kersey's

claims are barred as untimely.[2]  Even if the claims were timely

filed, because Kersey has not offered any evidence to rebut

WMATA's legitimate, nondiscriminatory reasons for its actions,

WMATA is entitled to judgment as a matter of law.  Accordingly,

WMATA's motion for summary judgment will be granted.

---

[1]  See Rep. & Rec. [Dkt. 114], Kersey v. Washington Metro.
Area Transit Auth., Civil Action No. 96-2639 (RWR) (AK), at 2
(D.D.C. July 24, 2006).

[2]  WMATA also argues that the doctrine of accord and
satisfaction bars Kersey's Rehabilitation Act claims.  That
argument is misplaced in this context.  The doctrine of accord
and satisfaction serves to defend a substitute performance on a
contract.  Restatement (Second) of Contracts § 281 cmt. a (1981)
("An accord is a contract under which an obligee promises to
accept a substituted performance in future satisfaction of the
obligor's duty.").  WMATA is not defending a substitute
performance on a contract in this action.  Furthermore, the
defense is available only in a breach of contract case.  Eagle
Maint. Servs. v. Dist. of Columbia Contracts Appeals Bd., 893
A.2d, 569, 582 (D.C. 2006) (stating that accord and satisfaction
is an affirmative defense to a breach of contract claim).  Kersey
has not alleged breach of contract in this action.

-3-

BACKGROUND

Kersey began his employment with WMATA in 1979.  In 1980, he got into a physical fight with three bus passengers, injuring his neck and back, and went on workers compensation leave status. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") Exs. 2, 4; Def.'s Mot. for Summ. J ("Def.'s Mot.") Exs. 2, 3.)  In September 1988, while Kersey was still on workers compensation leave from WMATA but working as a truck driver for another employer, he became embroiled in a fight with two WMATA employees on WMATA property.  He was arrested and charged with assault and carrying a deadly weapon.  (Def.'s Mot. Ex. 2.)  A month later, an internal WMATA memorandum noted that Kersey failed to report this arrest to WMATA, establishing cause sufficient for dismissal.[3]  (Id.)  A subsequent WMATA "file" memorandum written by WMATA Regional Director Monte Monteith concluded that:

> After discussing this case with Robert Dickerson from the Labor Relations Office, it was my opinion that Mr. Kersey had never been requalified for a position with the Authority.  The case was referred to Dr. O'Donnell.  On January 26, 1989, she wrote a memo which, in part, stated she had "no medical basis to reconsider" her "former decision of medical disqualification."  Therefore, Mr. Kersey's name should be dropped from the roles of the Authority.  Due to Mr. Kersey's past and current record of violent physical confrontations, which led to his arrest, he

---

[3] Once before, in 1984, WMATA had terminated Kersey's employment for failing to report arrests, a violation of WMATA's standing rules.  (Def.'s Mot. Exs. 2, 3.)  WMATA reinstated Kersey after the union filed a grievance on Kersey's behalf. (Pl.'s Opp'n Ex. 4.)

-4-

should not be given any consideration in the future
should he apply for employment with the Authority in
any capacity.

(Def.'s Mot. Ex. 5.)  A January 31, 1989 personnel action report
signed by Monteith and appending Monteith's file memorandum
terminated Kersey because "Operator Kersey has been medically
disqualified by the Authority's Medical Director."  (Pl.'s Opp'n
Ex. 11A).  A copy was sent to Kersey.  (Id. Exs. 1 ("Kersey
Dep.") at 201:14-17, 1B.)  Two weeks after Kersey was terminated,
a jury acquitted Kersey of the criminal charges stemming from the
September 1988 incident.  (Id. Ex. 9.)[4]  Shortly after that, in
March 1989, Kersey filed a union grievance protesting his
termination.  (Id. Ex. 1B.)

    Eddie Kornegay, the union local's president, began
negotiating on Kersey's behalf with Leroy Bailey, WMATA's
Assistant General Manager and Monteith's superior.  Kornegay
testified in his deposition that Bailey's sole concern during
these negotiations was Kersey's "record or a history . . . of
seeming to somewhat have a temper and getting himself involved in
altercations or confrontations and [Bailey] was most concerned

_____

    [4]  Four months later, Kersey filed a civil suit for assault
and battery and malicious prosecution against WMATA and the two
WMATA employees involved in the altercation, and was awarded
$100,000 in damages assessed against WMATA in February 1992.
(Pl.'s Opp'n Ex. 10.)  WMATA's Assistant General Manager, Leroy
Bailey, testified in a deposition that he did not know, and in
the course of his duties would have no reason to know, of
Kersey's civil suit against WMATA or the damages awarded.  (Id.
Ex. 12 ("Bailey Dep.") at 17:13-18.)

-5-

about that.  And the last incident involved or [was] alleged to
have involved a weapon and [Bailey] was most concerned about that
and that was the big hurdle that we was -- that I was wrestling
with with Leroy [Bailey]."  (Id. Ex. 7 ("Kornegay Dep.") at 57:7-
18.)  As a result of the discussions, WMATA, "considering re-
employing [Kersey] to a position other than Bus Operator," asked
Dr. Mary O'Donnell, WMATA's Medical Director, "to determine if
[Kersey] is physically qualified to work in other job
classifications within the Authority."  (Id. Ex. 6K.)
Dr. O'Donnell reported that Kersey was "in good health and
medically cleared for employment."  (Id. Ex. 6M.)  She later
testified that she did not evaluate Kersey at this time for the
position of bus operator because she had not been asked to do so,
and that she evaluated him only with respect to other positions
potentially available to him as a member of Union Local 922, not
all jobs within the Authority.  (Id. Ex. 6 ("O'Donnell Dep.")
at 113-14.)

In March 1990, WMATA offered a re-employment contract in
settlement of Kersey's 1989 termination grievance.  The contract
stated in relevant part:

> The Authority Medical Director has determined that
> Mr. Kersey is medically cleared for any position except
> bus operator.  Therefore, in full and final settlement
> of this grievance, the Authority will reinstate
> Mr. Kersey to a position of cleaner-shifter with the
> understanding that he will only be permitted to clean
> buses and under no circumstances will he be permitted
> to operate an authority vehicle.

-6-

(Id. Ex. 12A ("the 1990 contract").)[5]  Kersey signed the contract

on April 23, 1990, and Kornegay signed for the union.  (Id.)  The

next month, Kersey also signed a memorandum of understanding

("1990 MOU") that specified that

> [a]s a Cleaner-Shifter, you will be assigned to . . .
> cleaning bus interiors or other cleaning assignments
> which may be deemed appropriate by your Division
> Manager.  You will receive Cleaner-Shifter wages at the
> prevailing rate for the remainder of your career with
> the Authority.  You will not be permitted to operate an
> Authority vehicle (revenue and non-revenue) under any
> circumstances.

(Id. Ex. 20D.)  Bailey later testified that he insisted on the

driving prohibition in the 1990 contract because, in light of

Kersey's record of physical confrontations, he wanted to avoid

putting Kersey in a position that required him to interact with

the public.  (Id. Ex. 12 ("Bailey Dep.") at 12:18 - 13:1 (stating

that Kersey's "record bears out that he has had problems dealing

with people" and that "I did not believe that it was in anyone's

best interest return him to a position that would provide him

interface with the public."), 55:16-20 (stating that it was

"absolutely correct" that the reason for the driving prohibition

was to prevent Kersey from interacting with the public).)  In

addition to Kornegay's congruent testimony (see Kornegay Dep. at

---

[5]  Under ordinary circumstances, a cleaner shifter is
required to perform incidental driving tasks.  Because Kersey was
prohibited from driving, his cleaner-shifter position -- which
commanded higher pay than a cleaner position -- would entail the
duties of only the cleaner, not the shifter.  (Def.'s Mot. Ex. 8,
Aff. of Gerald Hobbs ¶¶ 3-5.)

57:7-18), Lloyd Shands, a WMATA Division Supervisor, gave testimony consistent with Bailey's explanation.  Shands testified that he learned from Bailey in the 1991 to 1994 time frame that the restriction was imposed to ensure that Kersey was in a "non-safety sensitive" position, meaning a position that would avoid having Kersey "deal[] with the general public."  (See Pl.'s Opp'n Ex. 14, ("Shands Dep.") at 15:11-25, 16:21; see also id. at 17:1-18, 21:13-20.)

Within six months of entering into the 1990 contract and signing the 1990 MOU, Kersey attempted to apply for a promotion to a position that would require driving an Authority vehicle. (Def.'s Ex. 9 ("Pl.'s Resp. to Inter. No. 8").)  WMATA refused to allow Kersey to take the promotional exam, explaining that because the 1990 contract provided that under no circumstances would Kersey be permitted to operate an authority vehicle, "it would be futile to allow Mr. Kersey to participate in the job test process knowing that he is precluded from operating Authority vehicles."  (Pl.'s Opp'n Ex. 7E.)  Because all mechanic positions require some driving of WMATA vehicles incidental to the job (id. Ex. 16 ("Briscoe Dep.") at 6:2-4; Bailey Dep. at 13:2 - 14:16 (testifying that mechanics must occasionally drive vehicles and in so doing interact with the public, and providing examples)), WMATA maintained that the 1990 contract's driving prohibition disqualified Kersey from all such positions.

-8-

In fact, the cleaner-shifter position held by Kersey under the
1990 contract normally requires incidental driving, but the
express terms of the 1990 contract assigned Kersey exclusively to
the cleaner duties and prohibited any driving of Authority
vehicles.  The union's position on this point, which remained
consistent over time, was that the driving required of mechanics
was so incidental to the position that the 1990 contract's
driving prohibition should not be applied to those positions.
(Kornegay Dep. at 116:12 - 117:24 (discussing mechanic
positions).)

     In April 1991, Kersey wrote again to Kornegay, "requesting
your immediate actions" to assist in reversing the "unjust and
unfair" "contractual agreement."  (Pl.'s Opp'n Ex. 7F.)  Kornegay
did not support Kersey in this effort because he "had very real
problems with this," since the union had engaged in "protracted
negotiations" and had "signed off on an agreement that put . . .
Kersey back on the payrolls with the Authority."  (Kornegay Dep.
at 95:19-23.)  Kornegay explained that "I had the integrity of
the local unions to be concerned about . . . .  I don't sign
agreements and start attacking them the next day.  I told
[Kersey] my concerns of that."  (Id. at 95:23-25, 98:13-14.)
Later that same month, Kersey filed an EEOC charge of
discrimination based on handicap, medical history, and
retaliation.  (Pl.'s Opp'n Ex. 19.)  Kersey continued to press

the union (id. Exs. 7G, 7H) for help to "undo the 1990 agreement" (Kornegay Dep. at 99:8, 99:23-24), but without immediate relief. (Id. at 99:10, 99:24.)

In July 1992, Kersey applied for a promotion to steam cleaner but was not permitted to complete the process because of the 1990 contract clause prohibiting driving an Authority vehicle. (Pl.'s Resp. to Interrog. No. 8.)  Within the next month or so, Bailey authored an undated "DRAFT" document with respect to that particular steam cleaner position. (Bailey Dep. at 83:3-7.)  The draft agreement included the following conditions:

> 1.  Mr. Kersey must possess a valid Maryland Commercial Drivers License or obtain one within thirty (30) calendar days from the date he is promoted to steam cleaner position.
>
> 2.  Mr. Kersey shall only be permitted to operate Metrobuses when it becomes necessary to move a vehicle from its parking area for steaming and return such vehicle after completion of work. Such driving shall be restricted to Landover Division Lot only.
>
> 3.  This agreement applies only to the Steam Cleaner position and is not intended to provide any further promotional opportunities unless specified through agreement with the local union.

This agreement becomes effective on the date of acceptance by Local 922 International Brotherhood of Teamsters.

(Pl.'s Opp'n Ex. 1C.)  Bailey later testified that this was the first time he was willing to consider giving Kersey the opportunity to test for a position that required driving a WMATA

-10-

vehicle (Bailey Dep. at 82:21 - 83:13), and the driving was to be
restricted to an area that eliminated the possibility that Kersey
would interact with the public.  (Pl.'s Opp'n Ex. 1C.)  The
record does not establish that the union ever accepted this
proposal.

In November 1992, Kersey applied for promotion to a mechanic
position and was not notified that he was eligible to test for
it.  (Pl.'s Resp. to Inter. No. 8.)  On September 28, 1993,
Kersey filed another union grievance, this time alleging
discrimination -- without specifying the type of discrimination
-- due to the 1990 contract.  (Pl.'s Opp'n Ex. 7I.)  In October
1993, Kersey again applied to test for a promotion to a mechanic
position and, as had happened the year before, he did not receive
notice that he was eligible to take the examination.  (Pl.'s
Resp. to Inter. No. 8.)  Kersey then filed a disability
discrimination charge with the EEOC on November 12, 1993,
complaining that he was denied training and promotion
opportunities due to a signed agreement.  (Def.'s Mot. Ex. 15.)

In January 1994, Kersey, Kornegay and another union
representative, Ferline Buie, met with Bailey and another WMATA
supervisor to discuss Kersey's latest grievance.  (Pl.'s Opp'n
Ex. 21 ("Buie Dep.") at 17:25 - 18:2.)  At this meeting, the
union asked that Kersey be medically re-evaluated, and WMATA
agreed.  (Id. at 22:9-11.)  Later, Bailey explained that he was

-11-

willing in 1994 to "revisit" the driving prohibition in the 1990

contract because over time, his view of duties appropriate for

Kersey had become less restrictive, but that his change in

opinion was not based on any medical justification.  (Bailey Dep.

at 82:6-18.)  The next month, a different WMATA Medical Director

concluded that

> [b]ased on extensive review of his medical records
> available, ergonomic analysis of his job as a Bus
> Operator and based on Dr. Nelson's medical report of
> Nov. 3, 1986 (which was the basis of the workmans comp
> decision of a 35% permanent disability rating), I
> recommend that the Authority should abide by this
> decision . . . [illegible] and not allow the employee
> to be exposed to a job such as bus driving that may
> aggravate or exacerbate a permanent disability.

(Pl.'s Opp'n Ex. 6P; O'Donnell Dep. at 147:9 - 148:20.)  WMATA

did not adopt this recommendation, but instead recommended an

independent medical examination.  (Pl.'s Opp'n Ex. 7O.)  The

union engaged Dr. Virgil Balint, who concluded in a report dated

July 13, 1994, that Kersey's "history of cervical and upper

thoracic sprain/strain, with possible myofascial pain" was

"resolved."  (Id. Ex. 6Q.)  He stated that "I think that at this

point the patient is perfectly capable of performing any kind of

job, including the job as a bus driver."  (Id.)  Dr. O'Donnell

reviewed and adopted Dr. Balint's report.  (O'Donnell Dep.

at 153:5-25, 155:8-17, 155:24 - 156:2.)

-12-

In December 1994, Bailey authored a memorandum of
understanding ("1994 MOU"), drafted for the signatures of Kersey,
the union, and WMATA, that stated in pertinent part:

> As the result of our most recent discussion
> relating to Glen Kersey cleaner/shifter . . ., after
> careful deliberation, I am prepared to rescind current
> restrictions on Glen Kersey.  Mr. Kersey will be
> permitted to operate Authority vehicles once he obtains
> a valid commercial drivers License (CDL)[.]  He will
> remain in bus maintenance, but can apply for any
> position in maintenance for which he can test and
> subsequently qualify.  Mr. Kersey must obtain a CDL
> within 120 days of this signed agreement.

(Def.'s Mot. Ex. 18.)  Bailey acknowledged that this was an
"offer" presented to the union (Bailey Dep. at 89:4), and that
"[i]f this had been agreed to, it would have allowed [Kersey] to
test for any job in the [union local's] maintenance area[,]" that
is, "mechanic positions." (Id. at 89:25 - 90:6.)  The record
establishes that this 1994 MOU was forwarded to the union.  (Id.
at 90:7-11).  However, as with the 1992 draft agreement, the
record does not establish that the union ever accepted this MOU.[6]

In August 1995, Kersey complained of his limited advancement
opportunities to his new second-line supervisor, Gerald Hobbs.
To understand the situation and its background, Hobbs initiated
discussions with both WMATA and union personnel, first setting up
a meeting with Kornegay to discuss modifying Kersey's 1990
contract.  When Hobbs went to the meeting on August 16, 1995,

---

[6]  Kersey has entered into a settlement of his claims
against the union and Kornegay in this case.

-13-

Kornegay was not present and Hobbs met with two other union officials.  (Pl.'s Opp'n Ex. 15 ("Hobbs Dep.") at 32:2-24.)  On August 18, 1995, Hobbs learned from Dr. O'Donnell that "there was no medical reason for limits on any job" for Kersey.  (Id. at 25:18.)  Hobbs next discussed the matter with Dickerson, in WMATA's Labor Relations office, on August 21, 1995.  Dickerson assumed responsibility for broaching the subject with the union, and noted that back pay and seniority were two issues that would have to be negotiated.[7]  (Id. at 25:19 - 26:5; 27:5-15.)  Hobbs drafted a document to address the back pay and seniority issues, proposing that WMATA "would allow Mr. Kersey to go through central training, to be re-qualified to drive a bus if he would not pursue any back pay and his seniority would fall in line with the contract statement and then [WMATA] would give him promotional opportunities."  (Id. at 27:20-25; see also id. at 29:6-11 (elaborating on the proposed terms).)  On September 1, 1995, Dr. O'Donnell documented that Kersey was cleared medically to work without restriction as a cleaner-shifter or mechanic -- positions that require driving a bus.  (O'Donnell Dep. at 157:3 - 158:6; Pl.'s Opp'n Ex. 6R.).  WMATA permitted Kersey to take the examinations for promotions to mechanic positions that were posted in September and November 1995.  (Pl.'s Resp. to Inter.

---

[7]  As part of the 1990 contract, Kersey had negotiated seniority status that was not consistent with the union contract regarding seniority.

-14-

No. 8; Hobbs Dep. at 12:7-10.)  Although he passed the tests and
was otherwise entitled to the promotion, Kersey was denied the
promotion for the express reason that his 1990 employment
contract prohibited him from driving an Authority vehicle.
(Pl.'s Resp. to Inter. No. 8; Hobbs Dep. at 12:11 - 14:6.)  On an
unspecified date in 1995, identified in the record only as
"sometime later" than the conversation Hobbs had with Dickerson
on August 21, 1995, Dickerson told Hobbs that Dickerson had
discussed the matter with Kornegay, and that Kornegay had
declined to pursue modifying Kersey's 1990 contract.  (Hobbs Dep.
at 29:14-25 (identifying the date as "sometime later" than August
but still in 1995.)

In October 1996, Kersey filed another EEOC charge alleging
disability discrimination and retaliation, identifying the first
act of discrimination as occurring on April 23, 1990, the date he
signed the 1990 contract with the driving prohibition.  On
November 22, 1996, Kersey filed this lawsuit alleging that the
promotion denials in 1993 and 1995 constituted disability
discrimination and retaliation.

## DISCUSSION

On a motion for summary judgment, "[t]he inquiry performed
is the threshold inquiry of determining whether there is a need
for a trial -- whether, in other words, there are any genuine
factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either
party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250
(1986).  Summary judgment may be granted only where the
"pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue of material fact and the moving
party is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c); <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002).  A
material fact is one that is capable of affecting the outcome of
the litigation.  <u>Liberty Lobby</u>, 477 U.S. at 248.  A genuine issue
is one where the "evidence is such that a reasonable jury could
return a verdict for the nonmoving party," <u>id.</u>, as opposed to
evidence that "is so one-sided that one party must prevail as a
matter of law."  <u>Id.</u> at 252.  A court considering a motion for
summary judgment must draw all "justifiable inferences" from the
evidence in favor of the nonmovant.  <u>Id.</u> at 255.  The nonmoving
party, however, must do more than simply "show that there is some
metaphysical doubt as to the material facts."  <u>Matsushita Elec.</u>
<u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).
Rather, the nonmovant must "come forward with 'specific facts
showing that there is a <u>genuine issue for trial</u>.'"  <u>Id.</u> at 587
(citing Fed. R. Civ. P. 56(e)) (emphasis in original).  In the
end, "the plain language of Rule 56(c) mandates the entry of
summary judgment . . . against a party who fails to make a

-16-

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The Rehabilitation Act prohibits discrimination "solely by reason of her or his disability" against an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). To establish a prima facie case of disparate treatment under the Rehabilitation Act, a plaintiff must demonstrate that he is (1) a handicapped person within the meaning of the Act, (2) who is qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) has suffered an adverse employment action because of the handicap. Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002). The Act also prohibits retaliation for engaging in activities to preserve or enforce one's rights under the Act. Duncan v. WMATA, 214 F.R.D. 43, 49-50 (D.D.C. 2003) (concluding that the Rehabilitation Act prohibits retaliation by incorporation of the American with Disabilities Act). To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) the employer was aware of the activity, (3) the plaintiff suffered an adverse employment action, and (4) there was a causal connection

between the protected activity and the adverse employment action.
Id. at 50.

A plaintiff bringing discrimination or retaliation claims
under the Rehabilitation Act may employ the burden-shifting
framework approved in McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973) in aid of his case when the defendant denies that
its actions were motivated by the plaintiff's disability.  McGill
v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000); Barth v. Gelb, 2
F.3d 1180, 1186 (D.C. Cir. 1993) (noting that the burden-shifting
framework may be appropriate in suits where the defendant
disclaims reliance on the plaintiff's handicap).  Under the
McDonnell Douglas framework, "[f]irst, the plaintiff has the
burden of proving by the preponderance of the evidence a prima
facie case of discrimination.  Second, if the plaintiff succeeds
in proving the prima facie case, the burden shifts to the
defendant 'to articulate some legitimate, nondiscriminatory
reason for the employee's rejection.'"  Texas Dep't of Community
Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (quoting
McDonnell Douglas, 411 U.S. at 802).  If the defendant offers a
legitimate, nondiscriminatory reason for its actions, and the
plaintiff fails to provide evidence which could lead a jury
reasonably to doubt the defendant's reasons, then the plaintiff
cannot survive summary judgment.  Carter v. George Washington
Univ., 387 F.3d 872, 881 (D.C. Cir. 2004).  This is so because

-18-

"[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at 253.

I.   TIMELINESS

The parties agree that Rehabilitation Act disability discrimination claims have a three-year limitations period,[8] and that retaliation claims under the Act have a four-year limitations period.[9]  They disagree, however, on when the claims in this case arose.

Kersey alleges that he was wrongly excluded from promotion opportunities sometime in late 1993 and then denied a promotion that was rightfully his in 1995.  Without addressing the distinct elements of each claim, Kersey argues that each act constituted both disability discrimination and retaliation.  (<u>See</u> Pl.'s Opp'n at 25-29 (failing to distinguish between the discrimination and

---

[8]  Because the Rehabilitation Act does not specify a limitation period, it is determined by reference to the applicable state statute of limitations.  <u>Doe v. Southeastern Univ.</u>, 732 F. Supp. 7, 8-9 (D.D.C. 1980).  D.C. Code § 12-301(8) provides a three year limitation period for personal injury claims.

[9]  A four-year limitation period applies to all federal claims made possible by a post-1990 enactment of Congress.  <u>Jones v. R.R. Donnelley & Sons, Co.</u>, 541 U.S. 369, 382 (2004).  The retaliation claim under the Rehabilitation Act was created in the Rehabilitation Act Amendments of 1992.  Thus, the four-year limitation period applies.  <u>See</u> <u>Duncan v. WMATA</u>, 214 F.R.D. at 49-50 (explaining the genesis of the Rehabilitation Act's retaliation claim).

retaliation claims except to note the different limitation
periods.)  He contends that he had three years from being
notified sometime in late 1993 that he was ineligible for a
promotion to file a disability claim, and four years from that
date to file his retaliation claim (id. at 25, 29), and concludes
that his lawsuit was timely filed on November 22, 1996.

WMATA counters that if Kersey has any claims arising from
the enforcement of the 1990 contract, they arose on April 23,
1990, when Kersey signed the contract that imposed the driving
prohibition that he now attacks as illegitimately discriminatory.
WMATA contends that on these facts, Kersey had until April 23,
1993, to file his disability discrimination claims, and until
April 23, 1994, to file any retaliations claims.  WMATA concludes
that all claims were time-barred when Kersey filed this action in
November 1996.

The parties' divergent positions turn on the single question
of whether WMATA modified or rescinded the 1990 contract at some
later point.  Unless WMATA rescinded or modified the driving
prohibition, then the limitation periods began on April 23, 1990,
when Kersey accepted the 1990 contract for re-employment, because
the promotion denials -- whether couched as discrimination or
retaliation -- were a "delayed, but inevitable consequence" of
the express terms of that contract.  Del. State Coll. v. Ricks,
449 U.S. 250, 257-58 (1980).  In Ricks, the Supreme Court held

-20-

that a cause of action challenging a decision that was to have future effects accrues "at the time the . . . decision [is] made and communicated . . . . That is so even though one of the *effects* of the [decision] . . . [does] not occur until later." Id. at 258. "It is simply insufficient for [a plaintiff] to allege that his [promotion denial] 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.'" Id. at 258 (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)). Yet, Kersey clearly states that his action is based on "WMATA's continued reliance on the April 23, 1990 agreement." (Def.'s Mot. Ex. 10, Pl.'s Supplemental Resp. to Third Set of Inter. No. 2 at 10.) Under the rule in Ricks, if WMATA did no more than apply the terms of the 1990 contract, then in order for Kersey to allege discrimination in being denied promotions, he would have to allege and prove that his promotion denials "differed discriminatorily" from the promotion denials of others who were under a similar driving prohibition.[10]   Id. at 258.  Kersey has

---

[10]   Kersey disputes that Ricks applies, and argues instead that Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363 (D.C. Cir. 1999), applies.  Kersey's argument is unavailing. Currier is distinguishable in important respects.  First, Currier involved a non-final adverse employment decision, which does not accurately describe the driving prohibition in the 1990 contract. Distinguishing between a final and non-final decision, the court in Currier noted that "[i]n Ricks the Supreme Court was careful to point out that an employer that expresses an 'official position' and simultaneously" -- or, presumably, later -- "'indicates a willingness to change its [official position]'

not done so.  If, however, as Kersey argues here, WMATA modified
or rescinded the 1990 contract at some subsequent point, then the
rule of <u>Ricks</u> is inapposite and Kersey's cause of action accrued
at some later date, raising the possibility that his lawsuit was
timely filed.

Kersey states that he is challenging "promotion denials in
1993 and 1995 for Mechanic jobs after being permitted to test for
those jobs [because] WMATA's actions in permitting Mr. Kersey to
test for jobs that require operation of a WMATA vehicle
effectively modified the 'no driving' restriction."  (Pl.'s Opp'n
at 1; <u>see also</u> <u>id.</u> at 13.)  Kersey variously argues that the 1990
contract's driving prohibition was modified or rescinded either
by agreement (<u>id.</u> at 13, 15, 16, 19) or by WMATA's conduct.  (<u>Id.</u>
at 1, 20-21).  Specifically, he asserts that through Bailey,
WMATA agreed in 1992 to allow Kersey "to apply for positions that
required him to drive a WMATA vehicle" (<u>id.</u> at 13; <u>see also</u> <u>id.</u>

---

based on the outcome of a pending grievance does not thereby
render that 'official position' a 'tentative' decision.  <u>Ricks</u>,
449 U.S. at 261."  <u>Currier</u>, 159 F.3d at 1367.  The 1990
contract's driving prohibition was in no respect a tentative
decision.  Bailey was the sole decision maker regarding the
driving prohibition (Bailey Dep. at 82:19-21), and he imposed the
prohibition as a management decision.  (<u>Id.</u> at 56:6-13.)  Second,
the rationale for applying equitable estoppel to disallow the
limitations defense in <u>Currier</u> was that an employee awaiting a
final decision may be understandably reluctant to file an EEOC
complaint.  That rationale does not fit these facts.  Kersey
filed an EEOC charge in April 1991 (Pl.'s Opp'n Ex. 19), another
in November 1993 (Def.'s Mot. Ex. 15), and a third one in October
1996 (<u>Id.</u> Ex. 16), as well as more than one union grievance
during the relevant period.

-22-

at 1, 16, 20-21), and agreed in December 1994 to allow Kersey to
take promotional tests for any position other than bus operator.
(Id. at 19, 21.)  He also argues that when WMATA permitted Kersey
to take promotional tests for mechanic positions in
September 1993, and in September and November 1995, it
effectively rescinded the driving prohibition.  (Id. at 1, 20.)
WMATA denies that the evidence supports the conclusions Kersey
makes.

    A.   Modification by agreement in 1992

    Kersey argues that "[i]n 1992 . . . Bailey agreed to allow
Mr. Kersey to apply for positions that required him to drive a
WMATA vehicle, effectively revising the earlier April 1990 'no-
driving' restriction."  (Id. at 13; see also id. at 15, 16, 21.)
In support, Kersey cites Bailey's deposition testimony at pages
82-83 and Kornegay's deposition testimony at pages 86-88 and 90.
Understood in the context of the full record, however, neither
Bailey's testimony nor Kornegay's testimony supports Kersey's
construction.  Bailey's testimony demonstrates that he did not,
in fact, modify the 1990 contract.

    Q [by counsel for Kersey]:  And were you willing to
    revisit that issue [of the "driving limitation," which
    "restricted" Kersey's "opportunities for promotion in
    the mechanical area"]?

    A [by Bailey]:  Quite obviously.

    Q:  So why were you willing to revisit the issue in
    1994 and not revisit it in 1992, for example?  If you

-23-

were so adamant in 1990 that he not be able to drive
any vehicle?

A:  I can only respond to you like this.  The
constitution is a might old document, and we had to
make amendments to it.  So what is the difference about
my opinion.  My opinion is subject to change over time
as a result of a change in circumstances.

Q:  But your opinion was not based on any medical
justification, isn't that right?

A:  No.

Q:  And you were the sole decision maker to decide
whether or not Mr. Kersey would drive a bus, right?

A:  That's correct.  We are talking about opportunity.

Q:  What was the earliest date that you can recall that
you decided that you would give Mr. Kersey the
opportunity to vie for positions within the authority
that required him to drive a WMATA vehicle?

A:  Oh, I don't know when the earliest time was.  Maybe
it could have been back in '92.

Q:  Well, just so we are clear for the record, the
proposal that you put forward to the union regarding
the steam cleaner position was in August of 1992.  Is
that your understanding?

A:  That's correct.

Q:  Can you think of a time earlier than August, 1992
when you were reconsidering your decision to allow
Mr. Kersey to drive WMATA vehicles?

A:  Not that I know of.

(Bailey Dep. at 82:6 - 83:13.)  The proposal referred to by

Kersey's counsel never became effective because the union never

accepted the offer.  (Pl.'s Opp'n Ex. 1C ("This agreement becomes

effective on the date of acceptance by Local 992 . . . .").)  The

offer was expressly limited to a single position, namely "[t]he
Steam Cleaner position in question [that] became vacant after a
recent termination." (Id.)  The offer was expressly "not
intended to provide any further promotional opportunities unless
specified through agreement with the local union." (Id. ¶ 3.)
This testimony, then, establishes no more than that WMATA was
willing to make a limited modification of the driving prohibition
in one instance, with certain express conditions.  Those
conditions were never met.  Neither Bailey's deposition testimony
nor the plain language of the written offer establishes that the
1990 contract's driving prohibition was modified in 1992.

The only other record evidence on which Kersey relies to
establish that the 1990 contract was modified in 1992 is the
following testimony by Kornegay.

> A [by Kornegay]:  I just told you, I went immediately,
> got ahold of Briscoe and got ahold of Bailey.  As a
> result of that, this [the interpretation that the
> driving prohibition was absolute, not merely limited to
> bus operator] was reversed.  Glenn Kersey after that
> was allowed to take -- apply for those jobs and take
> tests for them.
>
> Q: [by Kersey's counsel]:  What communication did you
> have with Mr. Briscoe regarding this issue?
>
> A:  Well, now, what do you mean [by] that?  I just got
> through telling you, I contacted Briscoe and I
> contacted Bailey.
>
> Q:  What did you say to Mr. Briscoe?
>
> A:  I can't tell you what I said, I mean, I got the
> necessary results.

Q:  Can you remember generally what was said – –

A:  No, I can't recall – –

Q:  – – in that conversation?

A:  – – no, I can't recall generally what I said.  I just told him that I was ticked that they had taken this position and that it was out of context.  Leroy [Bailey], I got hold of, he understood what the agreement was, he understood what we had agreed to, and it was reversed.

* * * *

Q:  You stated earlier that this –– his [Briscoe's] particular interpretation was overturned – –

A:  Yes.

Q:  – – is that correct?

A:  It was overturned.

Q:  How was that overturned?

A:  Glenn Kersey was –– subsequent to this, Glenn Kersey was allowed to apply for and take exams for mechanical jobs.

Q:  When was Mr. Kersey first allowed –– subsequent to this –– when was Mr. Kersey first allowed to apply for and test for positions other than cleaner-shifter?

A:  I can't give you times.  I know that subsequent to this, because we had the discussion and a result of that, this was overturned.

Q:  Was it within a year of this letter [of November 26, 1990, Pl.'s Opp'n Ex. 7E] being written?

A:  I can't tell you the time frame of when it was done, but it was done, I know it was done.

Q:  Who was it that made the decision –– who made the decision that Mr. Briscoe's interpretation should be overturned?

A:  LeRoy [Bailey] --

Q:  And when did Mr. Bailey do that?

A:  I can't recall.  I just know it was done.

Q:  It was subsequent to this --

A:  It was subsequent --

Q:  -- this letter?

A:  -- it was subsequent to this, yeah.

Q:  Did you inform Mr. Kersey after that that he could apply and test for positions other than that of cleaner-shifter?

A:  Yes.

Q:  When was that?

A:  I can't recall, but I know Glenn Kersey and I had conversations and I told him that he could apply for those jobs and not only did I tell him that, I urged him to apply for them.

Q:  Did you tell him that . . . in writing?

A:  I'm not sure I did it in writing.

Q:  Did you do it during a telephone call?

Q:  I probably did it in my office.  I mean, this was not something where I didn't see Glenn or Glenn was in the office probably two or three times a week. *Subsequent to this, this was reversed, Glenn Kersey was allowed to apply for mechanical jobs, he did apply for mechanical jobs, he did tests for mechanical jobs, and the record will so reflect.*[11]

* * * *

---

[11] The emphasis here identifies a remainder of an answer that Kersey does not cite.  In fact, Kersey did not test for any mechanic position prior to September 1995.

-27-

Q:  . . . and complaining that he was not being allowed
to apply for such positions?

A:  See, I don't know what time frame that we're
talking about.  I know that from the time Kersey first
brought this to my attention and I then contacted
Briscoe that there was some conversations between
Briscoe and I, that I eventually had to go to LeRoy
[Bailey], so the[re] could have been some time in the
time frame in-between there.  So I'm just not sure what
time frame that we're talking about.  So at that time,
during that time, Kersey could have very well still
been raising a question that, you know, his
circumstances had not changed.

Q:  Do you recall whether you took any actions on such
a complaint?

A:  Maybe I'm missing something here, but I thought I
just told you that when Kersey brought it to my
attention that I then went to Briscoe to get this
matter resolved and after we didn't get it resolved
there that I then went to LeRoy [Bailey] and that some
point subsequent to Kersey's bringing it to my
attention and the initial thing with Briscoe, sometime
subsequent to that, that that got reversed and Glenn
Kersey was allowed to apply for and test for mechanic's
job.  That's my answer.

Q:  Let me ask you again --

A:  Okay.

(Kornegay Dep. at 85:25 - 89:4, 90:1-25 (emphasis supplied).)

This testimony by Kornegay does not establish a date of

"reversal" of WMATA's position.  Moreover, the remainder of the

record affirmatively undermines any inference that the unspoken

date was in fact 1992.  Kornegay's testimony not cited by Kersey

shows that when pressed, he steadfastly refused to provide a date

on which Bailey's "reversal" occurred:

-28-

Q:  -- when was it that Mr. Bailey reversed
Mr. Briscoe's interpretation of the agreement?

A:  I can't recall when he did that.

Q:  Do you know whether it was in 1990?

A:  I can't recall when he did it.

Q:  Do you remember whether it was in 1991?

[Witness's counsel:]  Asked and answered.

A:  I don't know.

[Witness's counsel:]  – – he just told you he doesn't
recall when it happened.

A:  I don't recall when it happened.  I just know it
was subsequent to when the initial bid was done that it
got reversed, it was subsequent when we got that
reversed.  And you're asking me about times and I just
can't tell you that.

Q:  Do you know whether it was reversed within two
years of Mr. Briscoe's [November 1990] denial,
Mr. Briscoe's denial of Mr. Kersey apply for or testing
for positions, other than cleaner-shifter?

A:  Quite frankly, Counsel, I don't know what else to
say to you.  I told you I don't recall when it was
done, that's my answer.

Q:  So all you're telling me is that it's possible --

A:  I don't recall when it was done.

(Kornegay Dep. at 91.)  But, on further questioning by Kersey's

counsel, Kornegay placed the "reversal" long after 1992.

Q:  Is it your understanding that the negotiations with
Mr. Bailey resolved Mr. Kersey's September 28, 1993
grievance?

A:  Yes.

        *  *  *  *

-29-

> A:  It was my understanding as a result of those
> negotiations, that Glenn Kersey would not be denied the
> opportunity to apply for and be considered [for] those
> jobs that [were] in the mechanical department, even
> [though] they involved driving, so long as they did not
> involve driving a vehicle off the Authority's property.

(Kornegay Dep. at 154:2-4, 12-17.)  Thus, Kornegay's testimony

does not reasonably support an inference that WMATA modified or

rescinded the 1990 contract in 1992, or at any time prior to

Kersey filing a grievance due to not being promoted in 1993.

In short, Kersey's argument that WMATA modified or rescinded

the 1990 contract in 1992 is not supported by Bailey's testimony,

Kornegay's testimony or the documentary evidence.  Accordingly,

Kersey's disability discrimination and retaliation claims arising

from the promotion he sought but did not obtain in September 1993

are time-barred.[12]

B.   Modification by agreement in 1994

Kersey argues that WMATA modified the 1990 contract by

agreeing in December 1994 to allow Kersey to take promotional

tests for any position other than bus operator.  (Pl.'s Opp'n

at 19.)  As with the alleged 1992 modification, the record does

not support this contention.

---

[12] Even if one of Kersey's discrimination claims arose in
1993, as he asserts, he knew of it at least by November 12, 1993,
when he filed an EEOC complaint about it.  (See Def.'s Mot.
Ex. 15.)  Accordingly, his argument that his 1993 discrimination
claim was timely when he filed this action on November 22, 1996,
fails in any case.

-30-

The 1994 MOU that Bailey authored would have had the effect of modifying the driving prohibition to the extent of allowing Kersey to operate WMATA vehicles as part of a mechanic's job. (See Def.'s Mot. Ex. 18; Bailey Dep. at 89:4, 89:25 - 90:6.)  The 1994 MOU was forwarded to the union for signature, but was never accepted by the union and never became effective.  (Bailey Dep. at 90:7-11.)  This document, along with Bailey's testimony, demonstrates a willingness by WMATA to enter into a new agreement with certain conditions, but the record evidence does not establish that a new agreement was consummated or justify an inference that WMATA unilaterally rescinded the driving prohibition.

C.   Modification by conduct in 1995 [13]

Kersey contends that WMATA's act of permitting him to test for mechanic positions in 1995 effectively rescinded the no

---

[13]   Kersey variously asserts and implies that WMATA allowed him to take a promotional test for a mechanic position in 1993. (Pl.'s Opp'n at 1 (referring to "promotion denials in 1993 and 1995 for Mechanic jobs after being permitted to test for those jobs"); see also id. at 13, 21 n.23.  But see id. at 14-15 (acknowledging that Kersey applied, but was not permitted to test for the mechanic position in October 1993).)  There is no evidence in this record to support an inference that Kersey took a promotional test for a mechanic position in 1993.  To the contrary, Kersey's interrogatory response establishes that he was not permitted to test for any promotion in 1993 because WMATA was enforcing the driving prohibition in the 1990 contract.  (Pl.'s Resp. to Inter. No. 8 ("I never received a response as to my eligibility for testing.  I am informed that this had to do with the agreement I signed on April 23, 1990.").)

-31-

driving prohibition in the 1990 contract.  (Pl.'s Opp'n at 1, 20-
21.)  Kersey was, in fact, permitted to take promotional tests
for mechanic jobs posted in September and November 1995.  In each
case, he passed the test but was denied the promotion based on
the 1990 contract restrictions.  The record does not
affirmatively establish why WMATA permitted Kersey to take the
test for a position that he was barred by contract from holding,
and Kersey is entitled to justifiable inferences.  Liberty Lobby,
477 U.S. at 255.  Still, Kersey's interpretation of WMATA's
conduct is not tenable in light of the remainder of the record
evidence.

     The record establishes that beginning in the latter half of
August 1995, Kersey's supervisor, Hobbs, initiated talks with
both WMATA and union officials regarding the possibility of
amending Kersey's 1990 contract.  Dickerson, in WMATA's Labor
Relations office, noted that the related issues of seniority and
back pay would need to be resolved if the 1990 contract were
amended, and assumed the negotiations with the union.  (Hobbs
Dep. at 25:19 - 26:5; 27:5-15.)  Hobbs proposed a resolution of
the seniority and back pay issues.  (Id. at 27:20-25; 29:6-11).
After the discussions began, Kersey was permitted to take
promotional examinations.  Despite the discussions and WMATA's
apparent willingness to amend -- with certain conditions -- the
1990 contract, there is nothing in the record that establishes

-32-

that any amendments were ever executed or became binding on any party.

Kersey cites no law in support of his proposition that a futile or inconsistent action by a corporate employer constitutes a unilateral rescission of a condition of employment that was enforced both before and after that futile action.  Indeed, the law is to the contrary.

> [I]n the absence of an express declaration manifesting the intent not to claim the right allegedly waived, there must be a clear, unequivocal and decisive act of the party who is claimed to have waived its rights, so consistent with an intention to waive that no other reasonable explanation is possible.  Stated somewhat differently, an implied in fact waiver of a contractual right may arise only if the actions or conduct of the person against whom the waiver is asserted are inconsistent with anything other than an intention to waive the right.

13 Williston on Contracts § 39:28 at 626-27 (4th ed. 2000).

Here, there is an obvious "other reasonable explanation" for WMATA's inconsistent act, namely, that WMATA was willing to let Kersey take the promotional tests in anticipation of a modification of the 1990 contract, a modification that never materialized.  The evidentiary record in this case establishes that WMATA was willing to modify the 1990 contract -- provided that certain issues were satisfactorily resolved, and provided that the union was party to the modification.  For reasons not entirely clear on this record, that modification was never consummated.  The inconsistent conduct of allowing Kersey to take

promotional exams in the fall of 1995, considered in light of all
the record evidence, is not such an act that a reasonable jury
could find "no other reasonable explanation" than that WMATA
intended to rescind unilaterally the 1990 contract's driving
prohibition.

    D.   <u>Equitable estoppel</u>

    Kersey argues that WMATA should be equitably estopped from
asserting its statute of limitations defense.  (Pl.'s Opp'n
at 27.)  There is no dispute that equitable estoppel is
appropriately applied where the party asserting the defense has
done something affirmative -- whether by trickery,
misinformation, or some other device -- to prevent the plaintiff
from litigating in time.  (<u>See</u> <u>id.</u> (quoting <u>Currier v. Radio Free
Europe</u>, 159 F.3d at 1367 n.7).)  However, Kersey's proposition
that "Mr. Bailey lied in 1992 . . . when [he] authorized
Mr. Kersey to apply for jobs that required him to drive WMATA
vehicles and the 1990 'no-driving' condition did remain[] in
place," (<u>id.</u>), draws no support from the factual record.  There
is no evidence that Bailey or anyone else at WMATA authorized
Kersey to apply for jobs requiring driving at anytime before
September 1995, long after the applicable three-year and four-
year limitations periods on the 1990 contract had expired.
Moreover, the factual record affords no reasonable inference that
WMATA, through Bailey or anyone else, did anything during the

-34-

applicable limitations periods to prevent Kersey from complaining
that the 1990 agreement was impermissibly discriminatory.  Kersey
has not shown that he is entitled to the benefit of equitable
estoppel on this record.

A de novo review of the entire evidentiary record submitted
establishes that the pleadings, depositions, answers to
interrogatories and affidavits show that there is no genuine
issue of the material fact that WMATA did not rescind, amend or
modify the 1990 contract either by agreement in 1992 or 1994 or
by its conduct in 1995, as Kersey alleges.  The record evidence
does not provide an evidentiary basis on which a jury could
reasonably conclude that WMATA entered into an agreement in
either 1992 or 1994 that was effective to rescind the 1990
contract's driving prohibition, or that WMATA's conduct
effectively rescinded the driving prohibition at any point during
the relevant period.  Rather, the record establishes conclusively
that WMATA repeatedly enforced the 1990 contract's driving
prohibition from the time the contract was made through the last
event about which Kersey complains in this suit, the December
1995 promotion denial.  Kersey has shown only that he can
identify "some metaphysical doubt" as to some facts, provided
that other facts are ignored.  Matsushita Elec., 475 U.S. at 586.
That is not the test of evidence on a summary judgment motion.
Any cause of action -- whether for discrimination or retaliation

-35-

-- under the Rehabilitation Act that arose from WMATA's

enforcement of the 1990 contract was time-barred by the time this

complaint was filed in November 1996.  Accordingly, WMATA is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## II.  LEGITIMATE, NONDISCRIMINATORY REASONS [14]

WMATA claims that the 1990 contract prohibiting Kersey from

driving a WMATA vehicle is unrelated to any disability Kersey may

have or have had.  Rather, according to Bailey, who negotiated

the 1990 contract on behalf of WMATA, WMATA's sole motivating

concern was Kersey's record of violent confrontations with bus

passengers and others, and WMATA wanted to limit Kersey's contact

with the public in order to avoid any such problems.  (See Bailey

Dep. at 12:18 - 13:1, 55:16-20, 82:6 - 83:13 89:4, 89:25 -

90:11.)  Bailey's testimony on this point is supported by the

---

[14]  WMATA also argues that Kersey has not met the threshold
requirement of offering evidence sufficient to establish a prima
facie case of disability discrimination or retaliation.  (Def.'s
Mot. at 10-13, 23-27.)  That issue need not be decided here
because Kersey has not, in any case, rebutted WMATA's legitimate,
nondiscriminatory reasons for its conduct.  See Carter v. George
Washington Univ., 387 F.3d at 881 ("We need not determine whether
[the plaintiff] would meet the prima facie requirements . . .,
however, for [the plaintiff] has failed to present evidence from
which a reasonable fact-finder could infer that [the defendant's]
proffered reason for [it's decision] was pretextual. . . .  Nor,
for the same reason, need we address whether [the plaintiff] has
made out a prima facie case for retaliation.  If [the plaintiff]
has failed to provide evidence which could lead a jury to doubt
[the defendant's] legitimate nondiscriminatory reason[,] . . .
then [the plaintiff] cannot survive summary judgment in any
event.").

—

testimony of the president of the union local, who negotiated the 1990 contract on behalf of the union and Kersey.  (See Kornegay Dep. at 57:7-18 (stating that Bailey's sole concern was Kersey's violence and the fact that the last incident involved a weapon).)  It is also supported by the testimony of Shands, another WMATA supervisor.  (See Shands Dep. at 15:11-25 (stating that Bailey's goal was to have Kersey in a "non-safety sensitive" position).)[15] The documentary evidence -- specifically, the unexecuted 1992 draft agreement that would have allowed Kersey to test for one specific position, which did not entail contact with the public, and the unexecuted 1994 MOU that would have allowed Kersey to test for mechanic positions, which have very limited potential

---

[15]   Kersey argues that Shands' testimony "contradicted Bailey['s]" explanation that the sole reason for the driving restriction was to minimize Kersey's interaction with the public due to safety concerns.  (Pl.'s Opp'n at 10 n.8 (citing to testimony by Shands that one of the reasons Bailey gave for the driving restriction was that Kersey had been disqualified as a bus operator).)  Kersey's counsel asked Shands the following question:  "Was it your understanding from the conversation with Mr. Bailey that the condition that Mr. Kersey not be able to drive buses was, in part, due to a medical disqualification?" (Id. at 17:1-4.)  Shands' responded:  "That was my interpretation.  I don't know whether [Bailey] actually said it or not."  (Id. at 17:5-6.)  Pressed further, Shands said he learned of the medical "disqualifi[cation]" because it was referred to in Kersey's 1990 contract (id. at 17:12-18), and that Shands had "discussed it" with Bailey (id. at 17:17-18).  Shands also testified that he had called the medical office and received a copy of "[Kersey's] disqualification."  (Id. at 16:14-24). Even allowing all reasonable inferences from the evidence in favor of Kersey, Shands' testimony, considered in total, comes nowhere close to contradicting that safety was Bailey's sole concern in imposing the driving restriction.

-37-

for contact with the public -- is also consistent with Bailey's
testimony that it was Kersey's record of violence that motivated
the 1990 driving restriction and its continued enforcement.
Kersey has failed to provide evidence which could lead a jury to
doubt WMATA's stated reasons and find that they are mere pretext
for unlawful disability discrimination and retaliation or are not
genuine.  Because Kersey has not offered evidence sufficient to
create a genuine dispute as to the legitimate, nondiscriminatory
reasons WMATA offered for its conduct, WMATA is entitled to
judgment as a matter of law on the both the discrimination and
retaliation claims.

<u>CONCLUSION</u>

Because Kersey has not identified any genuine issue of
material fact as to whether WMATA, either by agreement or
conduct, rescinded or modified the 1990 contract's driving
prohibition, and because Kersey complains here of acts that were
the "delayed, but inevitable consequence[s]" of the express terms
of that contract, <u>Ricks</u>, 449 U.S. at 257-58, Kersey's action is
time-barred as to both the disability discrimination and
retaliation claims.  Moreover, even if the claims were timely
filed, because Kersey has not rebutted WMATA's legitimate, non-
discriminatory reasons for its actions, WMATA is entitled to
judgment as a matter of law.  Accordingly, WMATA's motion for
summary judgment will be granted.

-38-

An appropriate order accompanies this memorandum opinion.

SIGNED this 12th day of February, 2008.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge